Good morning, Your Honors, and may it please the Court. My name is Sam Donahue, appearing on behalf of Appellant Sivilson Geffrard, who is present in court today. I'm joined at Council's table by Ms. Shira Diamant. We're supervised law students under the supervision of Martina Estrada, who is also present at Council's table. Thank you. This morning I will be arguing the adverse credibility issue, Ms. Diamant will be arguing the Fermi settlement issue, and we would like to reserve two minutes for rebuttal. Okay. The immigration judge found that Mr. Geffrard was not a credible witness based on three perceived inconsistencies, which, viewed under the totality of the circumstances, do not support an adverse credibility finding. The most significant error made by the immigration judge was his application of a narrow and incorrect definition of the term come out. Geffrard testified that he and his partner decided to come out. He also testified, and has maintained consistently through these proceedings, that he never told anyone, including his family, about his sexual orientation, and that he did not know how the mob that brutalized his partner discovered that the couple was gay. The immigration judge created an inconsistency between these two statements by imposing his own definition of the term come out. He assumed that by coming out, Geffrard announced to all the world that he is gay. But, counsel, wasn't there a question raised regarding what come out meant and whether it meant the same as it meant in America? Wasn't that question asked? Your Honor, thank you. The immigration judge did ask that question, and we submit that the term coming out, first off, is short for coming out of the closet, which is a colloquial term. And we have here a communication between an English speaker and a native Haitian Creole speaker regarding a colloquial term communicated through a translator. But that question was asked, correct? Yes, Your Honor. And the answer was that it meant the same thing? Yes, Your Honor. And that was at, I believe, pages 104 to 105 of the record. And shortly after, Mr. Geffrard corrected the record by stating that no and testifying as he has consistently throughout these proceedings, that he did not live openly as a gay man in Haiti. What about the statement that he is said to have made to the border officers that he did not fear returning to Haiti? Yes, Your Honor. Thank you, Judge Rakoff. Regarding that statement, first off, I would like to point Your Honors to the fact that there is no memorialization in the record of that interview ever taking place. And this court has consistently What do you mean no memorialization? Sure, Your Honor. So this interview that occurred, all we know about this interview is that at some point after arriving in the United States, several immigration officers questioned Mr. Geffrard. This court has consistently cautioned against relying on testimony given at an informal proceeding, such as the one here, and using that to contradict statements that are made at a later testimony. Was there a report of the interview? There was not, Your Honor. There is no indication in the record. There is no report. How about the date, though? How about the inconsistencies between the two dates? Yes, Your Honor. Thank you. Of the murder and then also of the attack upon him. Yes, so Mr. Geffrard's asylum application states that he was attacked outside of his mother's house on December 9, 2014, and he later testified correctly that he was attacked on December 12, 2014. This court held in Wren v. Holder, Your Honor, that minor discrepancies in dates that cannot be viewed as attempts by the applicant to enhance his claim of persecution have no bearing on credibility. Is that a minor discrepancy? Yes. It seems like it goes to the core of his application in terms of the murder of his partner and then also what happened to him after that. And it seems like that would be a significant day for him. And to get that account to be either the same day or three days later, I'm just trying to figure out why that isn't significant. Your Honors, Mr. Geffrard's, I see my time has run out, but I would happily answer Your Honor's question if I may. Please answer. Yes. So it was certainly a traumatic and significant incident that occurred on December 12, 2014, and the murder of his partner on December 9, 2014. Your Honors, this court recognized in Wren, however, that victims of abuse often confuse the details of particular incidents, including the time and dates of particular assaults, Your Honors. Mr. Geffrard was 18 at this time. His partner was brutally murdered, and he was later attacked. So there might be some arguments why either none of these things are necessarily inconsistent, but the standard of review is that we have to uphold the credibility determination unless any reasonable adjudicator would be compelled to conclude to the contrary. So, you know, I hear your explanations, and they have a certain plausibility, but they certainly don't sound like they're definitive. Thank you, Judge Rakoff. So under the Real ID Act, yes, the standard of review for this court is substantial evidence. However, the Real ID Act does not give an immigration judge a blank check to insulate the reasonableness of his opinions from this court's review. And, Your Honor, specifically regarding the date discrepancy, this court and almost every other circuit has held that a trivial inconsistency in dates, such as this one, does not support an adverse credibility finding. Counsel, before you conclude, I'm looking at the excerpts of Record 276 through 284, and it seems to be a memorialization of an interview with your client, and you said this wasn't memorialized. What's your response? Yes, Your Honor. So I believe you're referring to the credible fear interview. In form that was completed. Yes. Wouldn't that be a memorialization of what occurred? Absolutely, Your Honor. And so that is, let me clarify, that is the credible fear interview. The memorialization I'm referring to is there was an interview that took place at some point after Mr. Graffard arrived in the United States. With an asylum officer? Yes, Your Honor, with multiple asylum officers, the record indicates. That is not the Officer Mulhern interview, Your Honor. Okay. All right. Thank you, Counsel. Thank you, Your Honor. Good morning, Your Honors. Shira Diamant, certified law student, on behalf of Petitioner Giffrard Sivelson, may it please the Court. Your Honors, to prove that a petitioner firmly resettled in a third-party country, the burden is on the government to prove that that petitioner received an offer allowing them to remain in that third-party country indefinitely. Now, here, Your Honors, the government did not meet this burden for two reasons. First and foremost, as a matter of law, the government failed to present any evidence that Petitioner Giffrard received any offer of residency in Brazil. Well, I'm sorry. The Brazilian database that they offered suggested that a Silvalson Giffard had been offered permanent residency. Why isn't it a reasonable inference that that was just a one-letter typo in the first name and it's your client? Yes, Your Honor. Thank you for your question. And if it's okay, I would address that in two parts. I would first like to start with the fact that, as you stated, that offer did not have Mr. Silvalson Giffrard's name on it. It had an individual Silvalson Giffrard, a different name, different letter. That's a pretty unusual name, and so it's common for people to misspell unusual names. Why wasn't it reasonable to think that this was just a clerical error and that the evidence that it was your client is substantial enough to support the determination by the agency? Yes, Your Honor. Thank you for your question. I would point you to pages 131 and 133 of the record, which lists names that are similar to that of petitioner. On top of that, this database submitted by the government is impartial, incomplete. It's a link that counsel today is unable to verify. What do you mean it's impartial? Impartial in that we just have this one page. There's no context as to the meaning of this document. It's old. It's translated. And now, Your Honor, even if the court wanted to take that leap and assume that this was a typo, which I would like to remind the court the government has not presented any evidence that this, in fact, is a typo, even if the court would like to make that leap, this legal mechanism, the only evidence they submitted, this one-page printout, does not rise to the standard required by this court. This court requires that any offer be for permanent indefinite status, and that's from the Maharaj case cited at 450F3D964. Didn't the government offer some supplemental documents that tend to show that Brazil had a program by which Haitian immigrants could receive permanent status? It seems like it isn't the database. And I know there was, you know, there's apparently a ñ well, you claim it's not the same person, but let's say if it could have been a typo, wouldn't it have been reasonable for the IJ to think that it was the same person in light of everything that the government submitted? Yes, Your Honor. In light of everything the government submitted, I would point to this printout again itself, which refers to Normative 97. Now, those documents that the government submitted to support the fact that Brazil allegedly offers Haitians a place of refuge seen mainly at pages 237 through 243 of the record, there we see that Normative 97 created temporary, limited work visas that were renewable every five years. And, Your Honors, this court in Mashishi v. Holder, and that's 519 Federal Appendix 963, found that evidence of a temporary work visa does not satisfy that indefinite permanent status that this court requires when seeing if a petitioner has firmly resettled. So what would the government ñ to satisfy your concern, what would the government have to show here? Yes, Your Honor. I see I'm out of time, if I may. Please answer. Thank you, Your Honor. I would point the court to the Shima v. Sessions case, 716 Federal Appendix 632. That was a recent case that this court saw, where the court looked to evidence such as the government submitting passports, submitting evidence of a permanent resident visa, similar in the AGG case, where this court discussed the need for evidence of refugee status, travel documents, something to give context to this legal database. Counsel, what do we do with your client's testimony? Because he was asked whether or not he had legal status in Brazil, and he said he had a protocol, and he said that the protocol allowed him to stay in Brazil and that he had resident status. Coupled with the other evidence, why isn't that enough to constitute substantial evidence? Thank you, Your Honor. So I believe the court is referring to the record around 100 or 107, where Mr. Jaffar testified that his name came out for residency. And in answering your question, I would point the court to the Haig-Haidapur case, 446 Federal Appendix at 30 and 31. And there the court made it very clear that a lay petitioner's own testimony regarding his resident status and his understanding of that status was completely irrelevant. And that takes me back to Your Honor's point that aside from this testimony, which in Haig-Haidapur as well as, Your Honor, in AGG, we are told that this is irrelevant, all the government has is this Brazilian database that's been printed, it's impartial, it's old, and it's been translated, and it does not satisfy the requirement that Mr. Jaffar would have been eligible to remain in Brazil for an indefinite period. Counsel, what is the case that says that the testimony is irrelevant? Yes, Your Honor. Haig-Haidapur, 446 Federal Appendix at pages 30. Well, that's a case that's not precedent. Your Honor, I would also cite to the AGG case where the court discussed the fact that the finding is not contingent on whether the resident applies for status and his knowledge of that status. So I would refer the court as well. Can I ask you a question? Yes, Your Honor. So the IJA denied cat relief. I want to ask you about that for two reasons. One, based on the adverse credibility finding, and then also, I believe, based on the country report, that there was nothing in there or nothing sufficient in there to grant relief under cat. So if you can, if there is no adverse credibility finding, what does that mean? And if the adverse credibility finding is sustained and we can't rely on anything that your client says, is there enough in the country report alone? Thank you, Your Honor, if I could address that as well in two parts. With regards to the adverse credibility finding prong, I would point the court to the Garcia v. Holder case, which is 749 Federal 3D 785, which tells the court that an adverse credibility finding alone itself does not always determine the outcome in a Convention Against Torture claim. And it takes you to the country report, right? Yes, Your Honor, which I would like to do. Which is what Judge McGee asked you about. Yes. Yes, Your Honor. With regards to the country report, the government has tried to paint Brazil as a place where Haitian immigrants are going to thrive, Haitian immigrants such as Mr. Giffard. However, this country report and the underlying documents that the government has submitted merely show that there's an economic crisis in Brazil, evidenced by the fact that Mr. Giffard, as we see on page 99 of the record, lost his job, which also would have made him ineligible for this temporary work visa. Well, we're talking about CAF, which is torture. Torture. And what if he's sent, I mean, why shouldn't he be sent back either to Haiti or to Brazil if we find that this whole bar doesn't prevent him from being sent back? Looking at the country report that the IJ looked at, is there anything in there, absent your client's testimony, that would support relief under CAF? Yes, Your Honor. I would first, again, remind the Court that that burden has not yet shifted to Mr. Giffard. However, if we are going to hypothetically assume that we now see that Mr. Giffard received an offer. What do you mean the burden hasn't shifted? He has to prove eligibility for CAF relief. I'm so sorry, Your Honor. I was still stuck on my resettlement. We're talking about CAF relief. Yes, I'm sorry, Your Honor. With regard specifically to the report, if it were to come to that for CAF, there are several sites within those Brazilian reports itself, cited within our brief, of incidents of the government's failure to acquiesce to torturous acts against individuals such as Mr. Giffard, not only Haitian individuals but individuals who are part of the LGBT community. All right, thank you, Counsel. Thank you. Good morning, Your Honors. May it please the Court, Cherise Pratt, on behalf of the respondent, William P. Barr. Your Honors, this Court should deny this petition as substantial evidence supports the adverse credibility determination. Your Honors are correct. So what about the question that was implicit in the last exchange? Is assuming for the sake of argument that we agreed with you that the credibility determination should be upheld, is that dispositive or can it be, in effect, trumped by the State Department country report? I would argue that it's dispositive. First, it's dispositive as to asylum and withholding. And second, if he hasn't demonstrated that he's actually a gay person, then the country report doesn't indicate that he would be at risk. Well, if we assume that he is a gay person, the adverse credibility determination doesn't trump any country conditions report that would establish that gay persons are subjected to torture, correct? Correct. But the country condition report says that there's no evidence that the Haitian government acquiesces to torture. And do we look to Haiti or do we look to Brazil? So he was firmly resettled in Brazil. So which country report are we looking at? Which one did the IJ look at? However, the IJ looked at Haiti because the IJ entered the removal order to Haiti. And so why is it that we're looking at Haiti if you think he's going back to Brazil? Don't we need to examine that? Yes, you would have to examine. So we'd have to send it back. The deportation order is for Haiti. So if you believe that, if you agree that he was firmly resettled in Brazil, then maybe it would need to be remanded. So did he request removal to one country or the other? No, not that I recall. So just help me take this through because I'm trying to figure this out, because it looks like the IJ looked at the Haiti country report. Is that correct? Yes. All right. So assuming we do find that there were adverse credibility, the adverse credibility determination made by the IJ should be affirmed. So we look at the country report to see if there's anything there that would support. Are you saying that we would not be able to factor in that he is a gay man? Well, if you found that his testimony wasn't credible, then, you know, as the IJ found, then how could it be that he is gay if his testimony is not credible? Oh, that's interesting. That's really remarkable. Because I don't think the IJ's adverse credibility determination went to that fact. I'm sorry. I'm sorry. The whole thing is the whole thing? We can't accept anything that he said? He said he has not proven he is gay. I saw that. That's why I'm asking this question. He said, you know, he hasn't proven he's gay, and that's when you look at the adverse credibility determination, are you saying it's all or nothing? Yes, because his testimony goes to the core of his claim, whether his alleged partner was murdered on December 9th and he was attacked the same day, or whether he. . . So how would, other than saying that he's gay and describing his past experiences, how would he go about proving that he was gay, if that's something he had to somehow some other way prove? He couldn't call his partner. His partner is dead. So what would you have him do, or what would the IJ have him do? Well, he testified that his mother came to his brother's house on December 13th and said he had to leave. His mother was the one who he claims witnessed the crowd coming to his house multiple times on December 9th and back on December 12th. His mother is the one who came to the brother's house and said he had to leave and would know the reasons, but there's no declaration or anything in the record from his mother. So apparently his family was told the reason why he had to leave. His mom came to the brother's house and said it. And so right now, the current posture of the case, what is the resolution in your mind? I think that the agency's decision should be affirmed. He wasn't found credible, and he had firmly resettled. . . Alternatively, he had firmly resettled in Brazil. He had an offer. . . No, but we don't have a country report from Brazil. But you're saying it doesn't matter because he didn't prove he was gay. He didn't prove he was gay. Where would he be deported to? He would go back to Haiti where he has had no anything bad happen to him with the police or with the government. I'm still hung up on when you say he didn't prove he was gay. He testified he was gay. There was no evidence in the record to the contrary. So your argument is that, oh, because you purportedly lied about some date, got it three days wrong, or because you purportedly lied about other things, we can't believe anything you say. You say you're a man. Oh, you haven't proven it. All we have is your statement you're a man. Oh, you say you're a human being? I don't know. Maybe you haven't proven that. That's the thrust of your argument, isn't it? No, it's with these specific the claim that he's making is that he's gay and that he's at risk of being persecuted or tortured because of that. That's a material fact in your view, not facts that don't make a difference. A material fact. And then for him to say the crowd was after him and his mother witnessed it, but there's no corroboration in the record to support that. Hasn't it been federal law from time immemorial that the rule of evidence accepted by some state courts that false in one is false in everything has been firmly rejected by the federal courts for decades, maybe even centuries? But here it's not false in one, false in everything. It's false in that claim. Can you speak right into the microphone? You're very soft spoken there. Yes. Thank you. It's not false in one, false in everything where it's the claim is I'm a gay man, I'm at risk of persecution and torture, but there are inconsistencies in his claim that go to the core of that claim. The only one that goes of the three inconsistencies, the only one that goes to the core of his claim about whether he's gay, arguably, is his whole business about whether he had come out or not. And the inconsistency turned there on what the IJ thought was the proper definition of come out, and it's that weak read that you say shows that he hasn't proven that he's gay? He also told the asylum officer, we decided to come out. I came out. Then they attacked us. What does that mean? Well, they asked him, what does that mean? And do you think there was a clear understanding between the both of them based on their exchange? Well, it wasn't just the asylum officer. It was also his testimony in court. The immigration judge asked him, so you started to openly live as a gay person? Yes. But that was contradictory, because he also described that he only met his partner in a setting that was secluded and hidden from other people. So it tells me that there was some problems regarding how they were communicating and whether they were communicating effectively, the IJ and the petitioner here, because everything he described, or a lot of what he described, was not an open arrangement. Right, but on the day of the arrest. So it seems like if he has some issues with the language, it seems like there might have been possibility that they did not understand each other on that very important point, because would you agree that some of the items that he describes or some of the statements he makes is that, well, he and I were open, but then we only met without his mother would know. He'd have to leave so his mother would not find out. They would have to meet at a grandfather's old sort of shed, and that was the only way that they could meet. So in terms of openness and what he was saying seemed very contradictory. But he did mention that on the day of the incident they had been together walking together, and then they separated, and that happened. Counsel, was there any argument made to the board regarding translation issues or errors in the translation? No, Your Honor. And I see him. All right, thank you. Okay, thank you very much. Rebuttal. Thank you, Your Honors. I'd like to just first clear up the record on the question of the country of removal. 111 of the record, the immigration judge did designate Haiti as the only country for removal. So if we decide this case on the adverse credibility determination and determine that that's substantial evidence in support of the removal order, do we get to the firm resettlement issue? Your Honors, if the adverse credibility holding is not reversed, I don't believe we do get to the firm resettlement issue. However, the cat relief is still in question. Your Honors, the second point I'd like to make is that, on the date discrepancy, regardless of whether the attack occurred on December 9 or on December 12, the fact remains that Mr. Jaffrard was attacked on the basis of his sexual orientation. What do you do with opposing counsel's argument that he never proved he was gay? Your Honor, I believe that, as I argued previously, that the immigration judge's understanding of that term come out and that false application of that definition is what led to this confusion in the record. I would also point this Court's opinion in SmithKline Beecham Corporation v. Abbott Labs, where this Court recognized that, I quote, coming out to many gays and lesbians is a life-defining moment of celebrating one's dignity and identity, and that deciding when and how and to whom one comes out is a vital part of this process. And the record is clear, Your Honors, that Mr. Jaffrard and his partner were open with each other, that they came out to each other, and that they hid their sexual orientation from the rest of the world. And back to the interview, Your Honor, that Judge Rawlinson, that you had raised at 284 of the record. Mr. Jaffrard, in his interview with Officer Mulhern, stated, I am afraid to be killed by the population because I'm a gay man. Your Honor, Mr. Jaffrard has consistently maintained throughout these proceedings that he is a gay man and that he has a legitimate fear for his life should he be returned to Haiti. All right, thank you, counsel. Thank you to all counsel. The case just argued is submitted for decision by the Court. And again, we thank the students and supervising attorney from Loyola Law School.
judges: Rawlinson, Murguia, Rakoff